1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

ERIC GILBERT,

Plaintiff,

v.

NORDSTROM, INC.; NAVY ACQUISITION
CO., INC.; NORSE HOLDINGS, INC.; ERIK
B. NORDSTROM; PETER E. NORDSTROM;
JAMES L. DONALD; KIRSTEN A. GREEN;
GLENDA G. MCNEAL; AMIE THUENER
O'TOOLE; GUY B. PERSAUD; ERIC D.
SPRUNK; BRADLEY D. TILDEN; MARK J.
TRITTON; ATTICUS N. TYSEN; EL
PUERTO DE LIVERPOOL S.A.B. DE C.V.,

Defendant(s).

Case No. 25-cv-00568-JHC

**VERIFIED STOCKHOLDER CLASS
ACTION COMPLAINT**

10
11
12
13
14
15
16
17
18
19
20

**PUBLIC REDACTED VERSION**

21
22
23
24
25
26
27
28

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT
Case No. 25-cv-00568-JHC
011293-11/3154264 V2

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ....................................................................................1

II.     PARTIES ...................................................................................................................2

III.    JURISDICTION AND VENUE ..................................................................................5

IV.     SUBSTANTIVE ALLEGATIONS .............................................................................6

        A.      Background of the Company ..........................................................................6

                1.      Nordstrom and the Nordstrom Family's Prior Take-Private
                        Efforts. ................................................................................................6

                2.      Liverpool Acquires a Nearly 10% Stake in the Company. ...............7

        B.      Nordstrom Launches a Sale Process. .............................................................8

        C.      The Company Engages with Various Parties, including Liverpool......................10

        D.      The Board Forms the Special Committee, Specifically Empowered to
                Take Actions Regarding the Anti-Takeover Statute..............................................11

        E.      The Nordstrom Brothers Disregard the Special Committee's Process
                and Continue to Engage in Discussions with Liverpool Regarding a
                Take-Private Without Board Approval. ..................................................................13

        F.      The Board Approves the Nordstrom Family Acting As a Group
                Under the Anti-Takeover Statute. ..........................................................................20

        G.      The Buyers Form a Group Without Board Approval in Violation of
                the Statute..............................................................................................................22

        H.      The Parties Reach an Agreement for the Sale of Nordstrom................................28

        I.      The Merger is Unfair .............................................................................................32

V.      CLASS ACTION ALLEGATIONS ...........................................................................35

COUNT I VIOLATION OF THE ANTI-TAKEOVER STATUTE AGAINST
        NORDSTROM ...........................................................................................................37

COUNT II BREACH OF FIDUCIARY DUTY AGAINST THE BUYER GROUP
        DEFENDANTS ..........................................................................................................37

COUNT III BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR
        DEFENDANTS ..........................................................................................................38

PRAYER FOR RELIEF ..........................................................................................................38

DEMAND FOR JURY TRIAL ...............................................................................................39

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Plaintiff Eric Gilbert, individually and on behalf of all others similarly situated, alleges the following:

## I.    PRELIMINARY STATEMENT

1.    This stockholder class action challenges an unfair and unlawful going-private merger orchestrated by insiders of Nordstrom, Inc. ("Nordstrom" or the "Company") to acquire the Company at an inadequate price of $24.25 per share (the "Merger").

2.    The Merger is the product of a flawed process that violated Washington's anti-takeover statute[1] and Nordstrom insiders' fiduciary duties. Members of the Nordstrom founding family and El Puerto de Liverpool, a Mexican retailer, who collectively own 43% of Nordstrom's stock (the "Buyer Group"), formed a Buyer Group and agreed amongst themselves to acquire the remaining Nordstrom shares they did not already own and to vote against alternative transactions before receiving approval to do so from Nordstrom's Board of Directors (the "Board").

3.    Washington Business Corporations Act ("WBCA") Section 23B.19.040 (the "Anti-Takeover Statute") provides that if stockholders collectively owning more than 10% of a Company's outstanding shares reach an agreement, arrangement, or understanding (an "AAU") among themselves with respect to acquiring or voting shares before receiving Board approval, a subsequent merger must be approved by stockholders holding two-thirds of the Company's shares excluding the shares owned by the buyers.  Plaintiffs allege the Board's purported approval of the Buyer Group's formation on September 3, 2024 (the "Belated Board Approval") was ineffective because the Buyer Group had already formed an AAU, thereby becoming an "acquiring person" prior to that date. Consequently, the Merger must comply with the heightened voting requirement of RCW 23B.19.040(1)(b)(iii), demanding approval by two-thirds of the disinterested stockholders.

4.    The Merger is substantively and procedurally unfair to Nordstrom's public stockholders. The Buyer Group, leveraging its controlling position and inside knowledge, allegedly dictated the process, ignored Special Committee deadlines and directives, and secured

---

[1] Washington Business Corporations Act Section 23B.19.040.

the Merger at an unfair price of $24.25 per share, plus a contingent $0.25 dividend. This price represents a "take-under" or negative discount compared to the stock's trading price shortly before the agreement and fails to reflect the Company's intrinsic value,  and recent positive performance. Financial analyses performed by the Special Committee's own advisors, as well as independent analyst price targets, indicate a higher value for the Company. Numerous equity analysts established price targets that were higher than the Merger price, including Morningstar ($38.50), Telsey ($26.00), Gordon Haskett ($25.00), Citi ($25.00), and TD Cowen ($25.00).

5.      Nordstrom's officers and directors further breached their fiduciary duties by allowing the Buyer Group to repeatedly violate standstill provisions contained in nondisclosure agreements without consequence and to dictate the Merger's unfair terms and timing. By permitting these contractual breaches, the Board failed to maintain control over the sale process and allowed the Buyer Group, comprised of conflicted insiders and significant stockholders, to coordinate improperly outside the established procedures. This lack of oversight enabled the Buyer Group to secure the Merger on preferential and unfair terms, to the detriment of unaffiliated shareholders.

6.      Accordingly, through this action, Plaintiff seeks, among other relief, declaratory judgment that the Merger violates the Anti-Takeover Statute, an injunction preventing the consummation of the Merger unless and until it complies with the Anti-Takeover Statute's voting requirements, findings that Defendants breached their fiduciary duties, and an award of damages to the Class and other relief, including attorneys' fees and costs, as appropriate.

## II.      PARTIES

7.      **Plaintiff Eric Gilbert ("Plaintiff")** is, and at all relevant times has been, a common stockholder of Nordstrom.  Plaintiff is a resident of Florida.

8.      **Defendant Erik. B. Nordstrom ("Erik Nordstrom")** has served as the Company's Chief Executive Officer since 2020 and a member of the Board since 2006.  Erik Nordstrom has spent more than 40 years with the Company, serving in a variety of executive and management positions.  Erik Nordstrom is the great-grandson of the Company's founder and the

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 2
CASE NO. 25-cv-00568-JHC
011293-11/3154264 V2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    second cousin of James Nordstrom, Jr., the Company's Chief Merchandising Officer. Erik
2    Nordstrom resides in Washington.

3        9.    **Defendant Peter E. Nordstrom ("Peter Nordstrom")** has served as the
4    Company's President and Chief Brand Officer since 2020 and a member of the Board since 2006.
5    Peter Nordstrom has spent more than 40 years with the Company, serving in a variety of executive
6    and management positions. Peter Nordstrom is the great-grandson of the Company's founder and
7    the second cousin of James Nordstrom, Jr., the Company's Chief Merchandising Officer. Peter
8    Nordstrom resides in Washington.

9        10.    **Defendant James L. Donald ("Donald")** has served as a member of the Board
10    since April 2020. Donald has served as the Co-Chairman of the Board for Albertsons Companies
11    since 2019 and previously served as Chief Executive Officer. James Donald resides in
12    Washington.

13        11.    **Defendant Kirsten A. Green ("Green")** has served as a member of the Board
14    since February 2019. Green served as member of the Special Committee in connection with the
15    Merger. Green has served as the founder and managing partner of Forerunner Ventures, a venture
16    capital firm, since 2010. Kirsten Green resides in California.

17        12.    **Defendant Glenda G. McNeal ("McNeal")** has served as a member of the Board
18    since February 2019. McNeal has served as the Chief Partner Officer of American Express since
19    2024, previously serving as the President of Enterprise Strategic Partnerships. Glenda McNeal
20    resides in New York.

21        13.    **Defendant Amie Thuener O'Toole ("O'Toole")** has served as a member of the
22    Board since March 2022. O'Toole served as member of the Special Committee in connection with
23    the Merger. O'Toole has served as the Vice President and Chief Accounting Officer of Alphabet,
24    Inc. since 2018. Amie O'Toole resides in California.

25        14.    **Defendant Guy B. Persaud ("Persaud")** has served as a member of the Board
26    since September 2023. Persaud has served as President of the New Business Unit of Procter &
27    Gamble since 2021. Guy Persaud resides in Ohio.

28

15. **Defendant Eric D. Sprunk ("Sprunk")** has served as a member of the Board since April 2023. Sprunk served as the Chairman of the Special Committee in connection with the Merger. From 1993 to 2020, Sprunk served in a variety of executive positions at Nike Inc., most recently as Chief Operating Officer from 2013 to 2020. Eric Sprunk resides in Washington.

16. **Defendant Bradley D. Tilden ("Tilden")** has served as a member of the Board since May 2022. From 2000 to 2022, Tilden served in a variety of executive positions at Alaska Air Group, Inc., most recently serving as Chairman from 2021 to 2022. Bradley Tilden resides in Washington.

17. **Defendant Mark J. Tritton ("Tritton")** has served as a member of the Board since April 2020. From 2019 to 2022, Tritton served as President and Chief Executive Officer of Bed Bath & Beyond Inc. Mark Tritton resides in California.

18. **Defendant Atticus N. Tysen ("Tysen")** has served as a member of the Board since January 2023. Tysen has served as the Senior Vice President Product Development, Chief Information Security and Fraud Prevention Officer of Intuit Inc. since 2021. Atticus Tysen resides in California.

19. **Defendant El Puerto de Liverpool S.A.B. de C.V. ("Liverpool")** is a Mexican corporation that operates as an omnichannel retailer with department stores and an e-commerce platform. Liverpool's stock trades on the Mexican Stock Exchange under the ticker "LIVEPOL." Immediately prior to the Merger, Liverpool owned approximately 9.6% of the Company's common stock.

20. **Defendant Norse Holdings, Inc. ("Parent")** is a Delaware corporation incorporated solely for the purposes of consummating the Merger. The sole stockholders of Parent are Erik Nordstrom and Liverpool.

21. **Defendant Navy Acquisition Co. Inc.** is a Washington corporation and direct wholly owned subsidiary of Parent, incorporated solely for the purposes of consummating the Merger.

22. **Defendant Nordstrom, Inc. ("Nordstrom" or the "Company")** is a Washington corporation that operates as a department store chain under the banners "Nordstrom" and

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

"Nordstrom Rack." The Company's headquarters are in Seattle, Washington. The Company's common stock trade on the New York Stock Exchange under the ticker "JWN."

23. The Defendants listed in ¶¶ 8-9, 19-21 above are referred to herein as the "Buyer Group Defendants."

24. The Defendants listed in ¶¶ 8-18 above are referred to herein as the "Director Defendants."

## III.    JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (3) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states and in which citizens or subjects of a foreign state are additional parties. As alleged herein, Plaintiff is a citizen of a state diverse from those of Defendants.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. Nordstrom, Inc. maintains its principal place of business in this District, many of the Director Defendants reside or conduct substantial business in this District, and many of the decisions and actions related to the challenged Merger occurred within this District.

27. This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and/or the wrongful acts alleged herein occurred in and/or were directed at this District.

28. Moreover, the Company's bylaws identify this District as a proper forum for the adjudication of the claims asserted in this action.[2]

---

[2] Nordstrom, Form 8-K at Ex. 3.1 at Art. II, §15 (Sept. 21, 2023).

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 5
CASE No. 25-CV-00568-JHC
011293-11/3154264 V2

## IV.    SUBSTANTIVE ALLEGATIONS

**A.    Background of the Company**

**1.    Nordstrom and the Nordstrom Family's Prior Take-Private Efforts.**

29.    Nordstrom, founded in 1901 as a shoe business, is a fashion retailer that operates under the store brands "Nordstrom" and "Nordstrom Rack."  The Company's "Nordstrom" store brand offers luxury brands with full-service amenities, while the Company's Nordstrom Rack store brand serves as an outlet for discounted or clearance merchandise from the "Nordstrom" banner. Both brands operate under their respective websites and mobile applications for digital shopping. As of February 2024, there were 93 Nordstrom stores and 258 Nordstrom Rack stores in the United States.

30.    The Nordstrom Family has led the Company for four generations.  Erik Nordstrom currently serves as CEO and a director, Peter Nordstrom serves as President and Chief Brand Officer and a director, and James Nordstrom serves as Chief Merchandising Officer.  Erik and Peter Nordstrom (the "Nordstrom Brothers") also serve as directors on the Company's eleven-member Board. Prior to the pending Merger, the Nordstrom Family collectively owned nearly 34% of the Company's outstanding common stock.[3]

31.    Between June 2017 and March 2018, the Nordstrom Family explored taking the Company private.  In response, the Board formed a special committee (the "Initial Special Committee"), advised by Centerview Partners LLC ("Centerview") and Sidley Austin LLP ("Sidley").

32.    On March 5, 2018, the Nordstrom Family indicated their intention to take the Company private at a price of $50 per share (the "2018 Proposal").  The Initial Special Committee determined that proposal was "inadequate" and ultimately terminated discussions with the Nordstrom Family after the committee "could not reach agreement with the [Nordstrom Family] on an acceptable price for the Company."

---

[3] Nordstrom, PREM 14A Preliminary Proxy Statement at 99 (Mar. 4, 2025) (the "Proxy").

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

2. **Liverpool Acquires a Nearly 10% Stake in the Company.**

33.    Liverpool is the fifth largest retailer in Mexico, operating approximately 300 high-end department stores, in addition to its e-commerce marketplace.

34.    In May 2017, the then-CEO of Liverpool and the current Chairman of the Liverpool board of directors, Graciano F. Guichard ("Guichard"), met with Blake, Erik, and Peter Nordstrom at an industry conference.  Thereafter, "Guichard and Erik and Peter Nordstrom remained in contact and met during annual trade conferences hosted by Microsoft in May 2018 and 2019."[4] During these meetings and "from time to time," Guichard and the Nordstrom Brothers "discussed ordinary course business matters regarding the Nordstrom and Liverpool business, their shared legacies as family-founded and -run businesses and the general industry environment."[5]

35.    In January 2022, Liverpool contacted the Nordstrom Brothers to express its interest in making a minority investment in Nordstrom.

36.    In September 2022, Liverpool filed a Schedule 13G with the SEC, disclosing that it had acquired 9.9% of the Company's outstanding shares via open market purchases.  At the time, Liverpool said the investment "present[ed] an attractive opportunity for geographic diversification."[6]

37.    Following Liverpool's investment, the Company adopted a poison pill that would be triggered if Liverpool or any other stockholder acquired a stake of more than 10% in a transaction not approved by the Board (the "Rights Agreement").[7]  Under the Rights Agreement, existing stockholders, including the Nordstrom Family, were grandfathered in.  The Rights Agreement was originally set to expire on September 19, 2023, but was later extended until September 19, 2025.[8]

---

[4] *Id.* at 29.

[5] *Id.*

[6] Pamela N. Danziger, *Mexican Retailer Liverpool Steps Up To Help Take Nordstrom Private*, Forbes (Sept. 5, 2024).

[7] Suzanne Kapner, *Nordstrom Adopts Poison Pill After Mexican Retailer Buys Stake*, WSJ (Sept. 20, 2022); Nordstrom Form 8-K (Sept. 20, 2022).

[8] *See* Nordstrom, Form 8-K (Aug. 21, 2023).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

38.    Since Liverpool's investment in 2022, "[f]rom time to time . . . representatives of Nordstrom have had discussions with representatives of Liverpool about Nordstrom's business and Liverpool's investment in Nordstrom."[9]

**B.    Nordstrom Launches a Sale Process.**

39.    At some unspecified point "[i]n the first half of 2023," the Nordstrom Brothers expressed support for the review of potential strategic alternatives, including a sale of the Company.[10]  The Nordstrom Brothers stated that while they had not spoken with other members of the Nordstrom Family, they believed "that both they and other members of the Nordstrom family would support any process the Nordstrom Board believed was appropriate."[11]

40.    On May 17, 2023, the Board met with representatives from Morgan Stanley & Co. LLC ("Morgan Stanley") to discuss "the Company's valuation and next steps regarding the Long-Term Plan and strategic options[.]"[12]  Thereafter, the Board requested that Morgan Stanley prepare a presentation for the Board regarding the Company's valuation, trading multiples, and strategic alternatives.[13]

41.    On June 21, 2023, the Board met and received the requested presentation from Morgan Stanley.[14]  Thereafter, "the Nordstrom Board confirmed that management should work with financial advisors to evaluate the various strategic alternatives that might be available to Nordstrom to enhance shareholder value."[15]

42.    Following the June Board meeting, Nordstrom management, led by then-CFO Cathy Smith ("Smith"), evaluated potential strategic alternatives with Morgan Stanley and Centerview, who was "onboarded following direction from the Nordstrom Board."[16]  "Over the course of the next several months," the Company's senior management, which included the

---

[9] Proxy at 30.

[10] *Id.*

[11] *Id.*

[12] NORDSTROM00000008.  The Proxy states that Morgan Stanley "served as a financial advisor to Nordstrom in connection with the adoption of its shareholder rights agreement in 2022 and activism defense matters in 2023[.]"  *See* Proxy at 31.

[13] NORDSTROM00000010.

[14] *Id.* at 010-011.

[15] Proxy at 31.

[16] *Id.*

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 8
CASE NO. 25-cv-00568-JHC
011293-11/3154264 V2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    Nordstrom Brothers, evaluated potential alternatives with Morgan Stanley and Centerview. Those

2    alternatives included "approaching Liverpool to increase to its ownership stake through a tender

3    offer" and "a take-private transaction of Nordstrom by a consortium of existing shareholders and

4    potential new investors, or a sale of Nordstrom to a financial sponsor or strategic party."[17]

5        43.    On November 14, 2023, Centerview updated the Board on the strategic review

6    process. The Proxy notes that the Board "discussed that a possible take-private transaction by a

7    consortium of existing shareholders and other investors might be an attractive alternative to

8    provide value to Nordstrom shareholders and affirmed that management should continue with

9    preliminary explorations of such a consortium take-private."[18]

10       44.    Thereafter, Smith authorized Morgan Stanley and Centerview to "privately contact

11   parties involved in the department store or specialty retail industries or with interest in retail

12   investments."[19]

13       45.    Morgan Stanley and Centerview cautioned Smith that refinancing Nordstrom's

14   existing capital structure in connection with a transaction "may be challenging given market

15   conditions."[20] Specifically, the Company's senior notes contained certain change in control

16   provisions totaling $2.5 billion, which would require an acquiror of Nordstrom to repurchase the

17   notes if they were downgraded by all three rating agencies following a change of control.[21] Both

18   Morgan Stanley and Centerview stated that due to the additional leverage, "a take-private with a

19   substantial equity rollover from Nordstrom's existing shareholders would likely be most attractive

20   to potential acquirors and would potentially avoid the necessity of such a refinancing."[22]

21       46.    As described herein, the change of control provisions in the senior notes loomed

22   over the entire sales process. They severely limited the Company's options and effectively

23   prevented anyone from acquiring Nordstrom without the participation of the Nordstrom Family.

24

25   _____

26   [17] *Id.*
     [18] *Id.*
     [19] *Id.*
     [20] *Id..*

27   [21] NORDSTROM00000080. *See also* Nordstrom, SC 13E3 at Ex. 16.CIV at 15 (Mar. 4, 2025).
     [22] Proxy at 31.

28

The overhang of the notes, along with the Company's positive performance and strong prospects, as shown below, should have cautioned the Board that this was not the right time to sell Nordstrom.

**C.    The Company Engages with Various Parties, including Liverpool.**

47.    From November 12, 2023, to January 19, 2024, Nordstrom entered into non-disclosure agreements (each an "NDA") with seven parties, including Liverpool, each of which included a standstill provision (each a "Standstill").[23]  Liverpool's NDA, for example, provided that for a period of 18 months, unless previously approved by Nordstrom's representatives ***on behalf of the Board*** in writing, Liverpool would not:

> assist, advise, act in concert or participate with or encourage others to[]
> directly or indirectly: (a) acquire (or agree, offer, seek or propose to acquire,
> in each case, publicly or privately), by purchase, tender offer, exchange
> offer, agreement or business combination or in any other manner, any
> ownership . . . of any material assets or businesses or any securities of
> Nordstrom . . . (b) publicly or privately offer to enter into, or publicly or
> privately propose, any merger, business combination, recapitalization,
> restructuring or other extraordinary transaction with Nordstrom or any
> direct or indirect subsidiary thereof . . . (f) enter into any discussions,
> negotiations, agreements, arrangements or understandings with any other
> person with respect to any matter described in the foregoing clauses…or
> form, join or participate in a 'group' . . . to vote, acquire or dispose of any
> securities of Nordstrom or any of its subsidiaries . . . (g) request that
> Nordstrom (or its board of directors or Nordstrom's Representatives)
> amend, waive, grant any consent under or otherwise not enforce any
> provision of this Section 4[.][24]

48.    Although the Nordstrom Brothers were Nordstrom directors and officers, they were participating in the sale process on their own behalf as potential purchasers of Nordstrom.  They were not acting on behalf of the Board.  As a result, all parties to an NDA were prohibited from discussing taking Nordstrom private with the Nordstrom Brothers ***unless they received prior written approval from someone acting on behalf of the Board.***

49.    From January 17 to February 2, 2024, Company management, including the Nordstrom Brothers, Centerview, and Morgan Stanley, held in-person management presentations with six potential bidders, including Liverpool.[25]

---

[23] *Id.* at 32.
[24] Liverpool, SC 13D at Ex. 99.A (Sept. 4, 2024).
[25] Proxy at 32.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

50.    On February 4, 2024, the Board held a meeting, attended by management, Sidley, Morgan Stanley and Centerview,[26] during which "Erik and Pete Nordstrom presented on their interest in participating in a potential transaction as shareholders, noting that they would be interested in retaining their ownership and that they *believed other* Nordstrom family members *and El Puerto de Liverpool* may also be interested in doing so."[27] Thus, this statement strongly infers that the Nordstrom Brothers spoke with Liverpool regarding a potential transaction prior to February 4 in violation of the Liverpool Standstill.

51.    During the February 4 Board meeting, the Nordstrom Brothers "proposed that they take an active role in a potential transaction, including with respect to identifying additional investors and engaging directly with interested parties regarding governance terms."[28]

52.    On February 6, 2024, Sidley held a discussion with the Nordstrom Brothers's counsel at Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), whereby WilmerHale stated that any transaction should be conditioned on approval by a special committee and a majority of the unaffiliated shareholders, and that the Nordstrom Family was not interested in selling their shares or supporting a sale in which they did not voluntarily participate.[29]

**D.    The Board Forms the Special Committee, Specifically Empowered to Take Actions Regarding the Anti-Takeover Statute.**

53.    On February 11, 2024, the Board held a meeting, attended by management and Sidley.  The Board discussed forming a special committee in light of the Nordstrom Brothers' interest in pursuing a take-private transaction (the "Special Committee").  The Board also discussed limiting the Nordstrom Brothers to negotiating post-closing governance matters (but not price) with other bidders, and permitting the Nordstrom Brothers' financial advisor, Moelis & Company LLC ("Moelis"), to conduct additional solicitation of potential bidders.[30]

54.    During the meeting, Board members Kirsten Green, Eric Sprunk, and Amie Thuener O'Toole "indicated a willingness to serve on the Special Committee should one be

---

[26] NORDSTROM00000034.
[27] *Id* (emphasis added).
[28] *Id.*
[29] Proxy at 33.
[30] NORDSTROM00000035.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1 formed."[31]   Thereafter, the Nordstrom Brothers joined the meeting and recused themselves but

2 stood present for the vote on the resolutions approving the formation of the Special Committee.[32]

3        55.     Notably, those resolutions state: "the options identified in [the] preliminary

4 evaluation included a possible acquisition of the Company in which certain significant

5 shareholders of the Company, including El Puerto de Liverpool, S.A.B. de C.V. (*'Liverpool'*) and

6 certain members of the Nordstrom family, retained all or a portion of their equity interest[.]"[33]  The

7 resolutions thus recognized that the Nordstrom Family and Liverpool's rollover would create

8 "potential conflicts of interest."[34]

9        56.     Among other things, the Special Committee was authorized to consider and

10 evaluate the advisability of a potential transaction, initiate and participate in discussions with

11 potential counterparties, including Liverpool and the Nordstrom Family, and retain its own

12 advisors.[35]

13        57.     The Special Committee was also authorized to "take such actions as the Special

14 Committee may deem to be necessary, appropriate or advisable in connection with the Company's

15 anti-takeover provisions," including the "approval or waiver of a Potential Transaction or any

16 Alternative Transaction, or any discussions, negotiations or formations of a 'group' relating

17 thereto, involving any potential counterparty or any of the Company's existing shareholders, for

18 purposes of Section 23B.19.040 of the WBCA [the "Anti-Takeover Statute"]."[36]

19        58.     The Anti-Takeover Statute[37] sets strict limits on transactions between a Washington

20 corporation and an "acquiring person," defined as "a person or group of persons, other than the

21 target corporation or a subsidiary of the target corporation, who is the beneficial owner of voting

22 shares entitled to cast votes comprising ten percent or more of the voting power of the target

23 corporation."[38]

---

24   [31] *Id.*

25   [32] *Id.*

26   [33] *Id.* at 035-041.
     [34] *Id.*

     [35] *Id.*

27   [36] *Id.*
     [37] *See, e.g.*, RCW § 23B.19.040.

28   [38] RCW § 23B.19.020(1).

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 12
Case No. 25-cv-00568-JHC
011293-11/3154264 V2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

59. For a period of five years after the acquiring person's "share acquisition time" (i.e., the time at which that person crossed the 10% threshold),[39] the corporation cannot engage in any "significant business transaction" (i.e., a take-private merger)[40] with an acquiring person unless:

> (i) The transaction is exempted by RCW 23B.19.030 [a section dealing with persons who inadvertently became acquiring persons];

> (ii) The significant business transaction or the purchase of shares made by the acquiring person is approved **prior to the acquiring person's share acquisition time** by a majority of the members of the board of directors of the target corporation; or

> (iii) At or subsequent to the acquiring person's share acquisition time, such significant business transaction is approved by a majority of the members of the board of directors of the target corporation and approved at an annual or special meeting of shareholders, and not by written consent, **by the affirmative vote of at least two-thirds of the votes entitled to be cast by the outstanding voting shares of the target corporation**, except shares beneficially owned by or under the voting control of the acquiring person.[41]

60. Under the Anti-Takeover Statute, a person is considered to "beneficially own" any shares owned by any other person with whom the first person has "any agreement, arrangement, or understanding [an "AAU"], whether or not in writing, for the purpose of acquiring, holding, voting, or disposing of the shares."[42] *Thus, any AAU between Liverpool and the Nordstrom Family would mean that the Nordstrom Family's shares would be aggregated with Liverpool's for purposes of the statute and Liverpool would become an acquiring person such that a subsequent Merger would require the approval of stockholders owning two-thirds of the Company's shares held by other investors.*

**E.    The Nordstrom Brothers Disregard the Special Committee's Process and Continue to Engage in Discussions with Liverpool Regarding a Take-Private Without Board Approval.**

61. On February 14, the Special Committee held its first meeting. Despite having the power to retain its own advisors, the Special Committee determined to continue being advised by Centerview and Morgan Stanley. The Special Committee also determined to retain Sidley, who previously advised the Company and full Board, as its "independent legal counsel," as well as

---

[39] RCW § 23B.19.020(14).

[40] RCW § 23B.19.020(16).

[41] RCW § 23B.19.040(1)(a)(i)-(iii) (emphasis added).

[42] RCW § 23B.19.020(5)(a)(i)(B).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  Perkins Coie to assist the Special Committee "regarding matters relating to Washington corporate
2  law requirements."[43]

3      62.    During its February 14 meeting, the Special Committee "acknowledged that
4  support for a transaction from members of the Nordstrom family and [Liverpool] will be critical
5  in light of their approximately 30% and 10% ownership, respectively, and the two-thirds voting
6  requirement for approval of a merger under Washington law."[44]

7      63.    On February 18, the Special Committee met again and discussed receiving the list
8  of post-closing governance terms from Erik Nordstrom that "he believed would be critical to
9  achieve his family's support for a transaction."[45]  The Special Committee discussed "the scope of
10  appropriate involvement by [] Erik and/or Pete Nordstrom in the Committee's process and to what
11  extent they should be permitted to be involved and/or aware of pricing discussions with potential
12  bidders."[46]

13      64.    On February 20, Erik Nordstrom held a discussion with Special Committee Chair
14  Sprunk, during which Erik Nordstrom requested that he and Peter Nordstrom be permitted to have
15  discussions with interested parties already involved in the process while its financial advisor
16  conducted outreach to additional parties.  Sprunk responded "that the Special Committee believed
17  it was important to have visibility into any discussions that Messrs. Erik and Peter Nordstrom had
18  with interested parties."[47]  Sprunk continued to have private negotiations with the Nordstrom
19  Brothers on February 22, February 26, and February 29 regarding post-closing governance terms
20  and the Nordstrom Brothers' involvement in the process.[48]

21      65.    On February 21, the Special Committee met and "indicated its desire to have at
22  least one of its financial advisors be included in any discussions between [] Erik and Pete

23

24

25  _____
   [43] NORDSTROM00000067.
26  [44] Id. at 068.
   [45] NORDSTROM00000069-070.
27  [46] Id.
   [47] Proxy at 35.
28  [48] Id.

**HAGENS BERMAN**

1    Nordstrom and the potential bidders."[49]  However, the Nordstrom Brothers were "unreceptive" to

2    the idea.[50]

3        66.    On February 27, the full Board met.  Erik Nordstrom conveyed that Moelis had

4    several calls with potential investors and expected the "reach outs" to take 2-3 weeks to conclude.[51]

5    After the Nordstrom Brothers left the meeting, the Special Committee and other independent

6    directors determined the next step in the process was to send process letters to the remaining

7    potential bidders to receive preliminary indications of interest.  The Proxy notes that the

8    independent directors "confirmed alignment with the Special Committee's proposal that [] Erik

9    and Peter Nordstrom must enter into a non-disclosure agreement with Nordstrom, which

10   agreement would, among other things, limit their ability to speak with third parties regarding a

11   potential transaction and include 'standstill' obligations, which would limit their ability to exercise

12   certain rights in connection with their ownership of Nordstrom Common Stock."[52]

13       67.    On March 3, the Special Committee held a meeting with its advisors.  They

14   discussed that Sidley had sent a draft NDA to WilmerHale, and that Erik Nordstrom "raised

15   questions . . . about the scope of involvement by the Committee's representatives in their future

16   discussions with interested parties."[53]  Two days later, at the direction of the Special Committee,

17   Morgan Stanley and Centerview sent a process letter to the interested parties, requesting

18   indications of interest by March 22.[54]

19       68.    On March 5, the Company released its quarterly earnings, reporting in-line revenue

20   results and an earnings-per-share beat. Nevertheless, the Company's stock price "slid 9% in

21   aftermarket trading on March 5 as its 2024 guidance was underwhelming."[55]  The Company's

22   stock price fell by 18% in the days following, from $20.90 on March 5 to $17.06 on March 18.

23

24       [49] NORDSTROM00000071-072.
         [50] NORDSTROM00000073.
25       [51] NORDSTROM00000042.
         [52] Proxy at 35.
26       [53] NORDSTROM00000075.
         [54] Proxy at 36.
27       [55] David Swartz, Nordstrom Earnings: *Signs of Progress but Outlook for 2024 Disappoints; Shares Attractive*,
     Morningstar Equity Research (Mar. 6, 2024).  *See also* Oliver Chen et  al., *Better Rack, Inventory Flow & Speed, But*
28   *Guidance Calls for Flattish 2024*, Cowen Research (Mar. 6, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

69.    On March 6, the Special Committee met, and Sidley provided an update on its discussions with WilmerHale concerning the NDA and side letter.  The side letter would permit the Nordstrom Brothers to engage in discussions with Liverpool and the remaining private equity firms, subject to certain conditions, including a restriction on any discussions about price and the required attendance of one of the Special Committee's advisors in such discussions.  The Nordstrom Brothers refused to agree to the conditions of the side letter and sought to engage in discussions with other bidders "subject only to providing updates to the [Special Committee]."[56] Sprunk also conveyed that Moelis had conducted a "premature" reach-out to four private equity firms prior to receiving Special Committee consent.[57]  Sprunk discussed the "need for Moelis to cease those discussions until the [Special Committee] provides consent."[58]

70.    On March 10, the Special Committee held a meeting.  Sidley noted the Nordstrom Brothers' counsel sent comments back on the NDA, reflecting that a waiver of the Anti-Takeover Statute was not being sought at that time, and shortening the standstill provisions from two years to six months.  The Special Committee also discussed the "involvement of [Liverpool] in the process to date."[59]

71.    During a March 13 Special Committee meeting, Sidley relayed its conversation with WilmerHale, who "made it clear that they were advising [] Erik and Pete Nordstrom to wait until after March 22, 2024 [i.e., receipt of indications of interest] . . . before determining whether to further negotiate and execute the NDA."[60]  Moreover, "Wilmer[Hale] also reiterated that they and their local Washington counsel [did] not believe a waiver of the Washington [Anti-Takeover Statute was] necessary at [that] time.  While all counsel agreed it may be helpful to have Washington counsel speak, Wilmer[Hale] sent a subsequent communication asking to hold off on such a meeting until process issues had been addressed."[61]

---

[56] NORDSTROM00000076.
[57] Id.
[58] Id.
[59] NORDSTROM00000078.
[60] NORDSTROM00000079.
[61] Id.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

72.    On March 19, *Reuters* reported that according to people "familiar with the matter," the Nordstrom Family was "seeking to take the U.S. department store operator private[.]"[62]

73.    On March 20, the Special Committee met and discussed the implications of the *Reuters* report.  Among other things, Sprunk stated that Erik Nordstrom informed Sprunk that he "placed a check-in call to [Liverpool]," whose message was "consistent," noting that they "remain[ed] interested in potentially increasing their investment in the Company[.]"[63]  *That call violated the Standstill, but the Special Committee made no attempt to enforce Liverpool's NDA.*

74.    On March 24, the Special Committee met, along with representatives from Sidley, Morgan Stanley and Centerview.  The Special Committee discussed Sponsor E's indication of interest to acquire the Company for $21.00-$22.00 per share in cash, "predicated on satisfactory agreements with potential partners including relevant protections and preferences[.]"[64]

75.    *The minutes from the March 24 meeting confirm that Liverpool and the Nordstrom Family had discussed a potential take-private by this time in breach of the Standstill.* Specifically, Smith reported on a conversation with Peter Nordstrom, wherein he "indicated that he had spoken with representatives of [Liverpool], who had expressed their ability to increase their investment to 45% of outstanding shares if necessary to accomplish a potential privatization opportunity."[65]  The Company's Chief Legal Officer, Ann Munson Steines "confirmed that Mr. Pete Nordstrom shared the same information with her."[66]  *Despite the conversations between Peter Nordstrom and Liverpool regarding a take-private, neither the Board nor the Special Committee approved either the Nordstrom Brothers or Nordstrom Family working with Liverpool as a "group" under the Anti-Takeover Statute at this time.*

76.    Morgan Stanley and Centerview noted that if Liverpool acquired up to 45% and the Nordstrom Family "rolled an approximately 30% stake," an acquisition within Sponsor E's price range would require approximately $900 million of additional financing, with Sponsor E likely to

---

[62] Greg Roumeliotis & Abigail Summerville, *Exclusive: Nordstrom's founding family in new bid to take US retailer private*, Reuters (Mar. 19, 2024).
[63] NORDSTROM00000080-081.
[64] Proxy at 37.
[65] NORDSTROM00000083.
[66] *Id.*

1    account for $750 million of the required financing.[67]  The parties also discussed the "status" of the

2    NDA with the Nordstrom Brothers, which still had yet to be executed, but agreed to "advance"

3    such discussions.[68]

4       77. On March 29, 2024, the Special Committee's legal advisors (Sidley and Perkins

5    Coie) held a discussion with the Nordstrom Brothers' Washington counsel at Davis, Wright and

6    Tremaine LLP to discuss the terms of the NDA, as well as the applicability of the Anti-Takeover

7    Statute.  According to the Proxy, the parties agreed that they "should agree to take (or refrain from

8    taking) such actions and structure the transaction in such a manner as to ensure that the Washington

9    [Anti-Takeover Statute] not be applicable to the potential transaction."[69]

10       78. On March 30, 2024, the Special Committee held a meeting to provide the other

11    independent directors with an update on the process to date.  Among other things, Steines reiterated

12    that she understood from Erik Nordstrom that "[Liverpool] had expressed that it could acquire up

13    to 45% of outstanding shares in a transaction."[70]  Centerview and Morgan Stanley presented on

14    preliminary valuation and potential take-private scenarios in a transaction with the Nordstrom

15    Family and Liverpool.[71]

16       79. On April 3, 2024, the Special Committee met, and Sidley provided an update on

17    the ongoing discussions concerning the NDA and Anti-Takeover Statute.  The Special Committee

18    instructed Sidley "to continue holding firm" on the requirement of a 12-month standstill as a term

19    of the NDA.[72]

20       80. On April 4, WilmerHale informed Sidley that certain trusts would be transferred to

21    the Nordstrom Brothers due to the declining health of their father, Bruce Nordstrom, requiring the

22    Nordstrom Brothers to file a Schedule 13D and publicly report their exploration of a privatization

23    of the Company.[73]  A few days later, the Special Committee met to discuss the development, where

24

25      [67] *Id*. at 083-084.
  [68] *Id*. at 084.

26      [69] Proxy at 37.
  [70] NORDSTROM00000085.

27      [71] *Id.*
  [72] NORDSTROM00000087.

28      [73] Proxy at 38.

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 18
CASE NO. 25-cv-00568-JHC
011293-11/3154264 V2

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    Sprunk reported that a meeting of the Nordstrom Family was being arranged.[74]  Moreover, the

2    Nordstrom Brothers were still considering the Special Committee's condition that one of its

3    advisors attend any of the Nordstrom Brothers' private discussions with potential investors.[75]

4         81.    On April 10, the Special Committee held a meeting to discuss updates on NDA

5    negotiations with the Nordstrom Brothers.[76]  Following an update from Sprunk, the Nordstrom

6    Brothers joined the meeting to discuss their positions on the open items of the NDA.[77]  The

7    Nordstrom Brothers stated that the 12-month standstill provision was "acceptable" but pushed

8    back on the condition that the Special Committee's advisors attend their private discussions with

9    Party E.[78]  The Nordstrom Brothers provided three rationales for their position: (1) the Nordstrom

10   Brothers' counsel "advised them they would face heightened exposure to personal liability as

11   shareholders if advisors other than their own participated in the process;" (2) the Nordstrom

12   Brothers "believe[d] it would be extremely difficult, if not impossible, to segregate completely

13   discussions about governance from price;" and (3) "[d]iscussions regarding certain governance

14   subjects as well as structure may be different in a private company from their views as officers and

15   directors of a public company."[79]

16        82.    On April 13 and 14, the Special Committee held a meeting and agreed to revise the

17   NDA to require that the Nordstrom Brothers "provide information regarding their discussions with

18   potential third-party investors and related documentation at the time of a bid submission."[80]  *In*

19   *other words, the Special Committee conceded to the Nordstrom Brothers' demands and would*

20   *not supervise such discussions despite previously recognizing the Nordstrom Brothers' conflicts*

21   *of interest.*

22

23

24

---

25   [74] NORDSTROM00000088.

     [75] *Id.*

26   [76] NORDSTROM00000089.

     [77] *Id.*

27   [78] *Id.*

     [79] *Id.*

28   [80] NORDSTROM00000091-092.

**F.      The Board Approves the Nordstrom Family Acting As a Group Under the Anti-Takeover Statute.**

83.      On April 17, 2024, the Special Committee met, along with Sidley, Morgan Stanley and Centerview.[81]  They discussed a draft press release to be issued by the Company confirming that the Nordstrom Brothers were exploring a potential transaction and that the Special Committee was formed in response.[82] It was noted that the Nordstrom Brothers had agreed to the terms of the NDA.[83]

84.      That same day, due to the health of the Nordstrom Brothers' father, Bruce Nordstrom, the Nordstrom Brothers publicly announced they had acquired nearly 8.5 million shares of the Company's common stock through certain trusteeships from their father, increasing their ownership to approximately 9.52% of the Company's outstanding shares.[84]

85.      Also on April 17, the Nordstrom Board (including the Nordstrom Brothers) executed a unanimous written consent approving the formation of a group among the Nordstrom Brothers, Bruce Nordstrom, Anne Gittinger, James Nordstrom Jr., or any of their affiliates or associates (the "Family Group") for purposes of the Anti-Takeover Statute.[85]  ***However, the written consent made clear that the consent only applied to the Family Group; a new consent would be required for any new group***:

> [F]or the avoidance of doubt, in the event that (x) any members of the Transaction Group [i.e., the Family Group] (I) form a group with any persons other than the other members of the Transaction Group or (II) form a new group with one or more members of the Transaction Group and/or any other persons after the Transaction Group has been disbanded in accordance with the Proposed NDA and (y) such group 'beneficially owns' voting shares comprising 10% or more of the outstanding voting power of the Company, then the Additional Approval[86] shall be required if the

---

[81] NORDSTROM00000093-094.

[82] *Id*.

[83] *Id*.

[84] Nordstrom, Schedule 13D at 4 (Erik B. Nordstrom) (Apr. 18, 2024).

[85] NORDSTROM00000220-223.

[86] *Id.* ("[The Anti-Takeover Statute] prohibits the Company from engaging in a 'significant business transaction' involving an 'acquiring person' or its 'affiliates' or 'associates' for a period of five years following the 'acquiring person's' 'share acquisition time' unless (i) the purchase of shares or 'significant business transaction' is approved by a majority of the members of the Board prior to such 'share acquisition time' or (ii) at or subsequent to the 'acquiring person's' 'share acquisition time', such 'significant business transaction' is approved by a majority of the members of the Board and approved at an annual or special meeting of shareholders, and not by written consent, by the affirmative vote of at least two-thirds of the votes entitled to be cast by the outstanding voting shares of the Company, except shares beneficially owned by or under the voting control of the 'acquiring person' (the approval contemplated by this clause (ii), the "Additional Approval")[.]").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

Company engages in a 'significant business transaction' involving such group . . . during the five year period after the formation of such group unless a majority of the members of the Board approves, in advance, the formation of such new group.[87]

86.    Later that day, the Company entered into the NDA with the Nordstrom Brothers, which, among other things, included a 12-month standstill provision restricting the Nordstrom Brothers' ability to make proposals to acquire Nordstrom.[88]  Under the terms of the NDA, unless requested in writing by the Special Committee, the Nordstrom Brothers could make a private acquisition proposal only after Nordstrom "entered into a definitive written agreement providing for any acquisition of 30% or more of the voting securities of Nordstrom by any person or group."[89] The NDA also limited the ability of the Nordstrom Brothers to discuss a potential transaction with third parties without written consent, which the Special Committee did not provide for weeks.[90]

87.    On April 18, 2024, the Company publicly disclosed the Nordstrom Brothers' interest in pursuing a take-private transaction and the formation of the Special Committee.[91]  The Proxy notes that "[i]mmediately prior to the issuance of the press release and with the permission of the Special Committee, Mr. Erik Nordstrom contacted representatives of Liverpool to inform Liverpool that Sponsor E and Messrs. Erik and Peter Nordstrom would be interested in pursuing a potential transaction."[92]  *Those discussions violated both the Liverpool Standstill and the Nordstrom Brothers' Standstill.*

88.    In response to the news, analysts at Morningstar Equity Research noted that "as Nordstrom's shares trade at about half our per-share $38.50 fair value estimate, we are concerned that an offer price may not provide full value to shareholders," writing that "Nordstrom's sales and operating margins will improve in 2025 so *it would be unfair to shareholders if the insiders buy the company at a valuation that we believe is only temporarily depressed*."[93]

---

[87] *Id.*

[88] Nordstrom, Form 8-K at Ex. 99.2 (Apr. 18, 2024).

[89] *Id.*; Proxy at 38.

[90] Nordstrom, Form 8-K at Ex. 99.2 (Apr. 18, 2024); Proxy at 38.

[91] Nordstrom, Form 8-K (Apr. 18, 2024).

[92] Proxy at 38-39.

[93] David Swartz, *Nordstrom: Value of Possible Acquisition by Insiders Depends on Price Offered; Shares Undervalued*, Morningstar Equity Research (Apr. 18, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

**G.    The Buyers Form a Group Without Board Approval in Violation of the Statute**

89.    After the Nordstrom Brothers disclosed they were seeking to take the Company private, their attempts to reach agreements with potential equity financing partners accelerated. However, in the months that followed, they could not reach an agreement with any partner other than Liverpool.  Critically, the Nordstrom Brothers and Liverpool reached an AAU to jointly acquire Nordstrom and to vote against alternative acquisition proposal *before* the Board granted them a waiver to do so under the Anti-Takeover Statute.

90.    On April 21, 2024, Sprunk relayed to the Special Committee that Erik Nordstrom had spoken with the CEO of Liverpool to "discuss a meeting and that a discussion about the current process occurred with his aunt and cousins."[94]

91.    On April 28, 2024, Erik Nordstrom informed the Special Committee that he and Peter met with Liverpool and asked Liverpool to increase its investment, which  Liverpool was interested in doing.[95]  After he left the meeting, Sidley informed the Special Committee it was preparing a letter authorizing Party A to discuss a potential transaction with the Nordstrom Brothers as required by Party A's nondisclosure agreement.[96]  Party A's request for written permission before engaging in such discussions illustrates that all counterparties to nondisclosure agreements, including Liverpool, should have received such written permission before discussing a potential transaction with the Nordstrom Brothers.[97]  Nonetheless, Liverpool continued to have unauthorized discussions with the Nordstrom Brothers.

92.    On May 1, 2024, Morgan Stanley and Centerview provided a valuation presentation to the Special Committee that demonstrated that the Company's long-term plan projected better performance than the consensus of public equity analysts.[98]  The Special Committee charged forward with the sale process anyway.

---

[94] NORDSTROM00000095-096.
[95] NORDSTROM00000098 ("[Liverpool] responded positively to this suggestion and indicated a diligence request would be forthcoming.").
[96] *Id.*
[97] *Id.*
[98] NORDSTROM00000099.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

93.     On May 5, 2024, the Special Committee held a meeting with its advisors and the other outside directors.[99]  As part of their discussions, the Special Committee was informed that Liverpool had told the Nordstrom Brothers that it was willing to purchase up to 49% of the Company's equity in a transaction.[100]  ***This indicates these parties may have reached an AAU with respect to acquiring Nordstrom at least by this time, which resulted in them comprising a group that shared beneficial ownership of each other member's shares pursuant to the Anti-Takeover Statute.***

94.     In addition to running afoul of the Anti-Takeover Statute, ***these conversations between the Nordstrom Brothers and Liverpool violated the Liverpool NDA***.  According to the Proxy, the Company did not execute a letter agreement with Liverpool permitting those discussions until May 8, 2024.  The Special Committee also belatedly entered into similar letter agreements with prospective bidders around this time even though most of them already had unauthorized discussions with the Nordstrom Brothers.[101]

95.     The Special Committee did not attempt to enforce Liverpool's, or any or anyone else's, Standstill.  Nor did it attempt to use the repeated breaches of those Standstills as leverage in the negotiations.

96.     In the months that followed, the Nordstrom Brothers continued their efforts to secure additional financing partners beyond their family members and Liverpool.  During this time, the Special Committee repeatedly set bid deadlines that the Nordstrom Brothers ignored as they continued discussions with other potential financing partners.  Instead of insisting that the Nordstrom Brothers meet its deadlines or terminating the process, the Special Committee refused to assert its authority and instead let the Nordstrom Brothers dictate the timing of the sale process.

97.     Similarly, the Special Committee made no effort to encourage competitive bidding or to ensure prospective bidders abided by the Anti-Takeover Statute.  Instead, it allowed the Nordstrom Brothers to hijack the process as they sought to bring all prospective bidders into their

---

[99] NORDSTROM00000100-101.

[100] *Id.* ("It was noted that Liverpool has told Messrs. Erik and Pete Nordstrom that they are willing to purchase up to 49% of the total equity in a transaction.").

[101] Proxy at 39-40.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1    own group. During this time, the Nordstrom Brothers were also working to secure the support and

2    participation of their other family members.

3    98.    By mid-July, Liverpool told the Nordstrom Brothers that it would supply up to 60%

4    of the capital required for a transaction, *a further AAU that implicated the Anti-Takeover*

5    *Statute*.[102]  Then, on August 4, 2024, Peter Nordstrom informed the Special Committee that they

6    believed the extended Nordstrom Family and Liverpool could complete the Merger themselves

7    without any additional third party providing equity financing.[103]

8    99.    Still, the Buyer Group delayed the process until they could present a completely

9    packaged bid to the Special Committee. For example, on August 14, 2024, Pete Nordstrom

10   informed Sprunk that the Nordstrom Family and Liverpool still needed additional time before they

11   could submit a proposal because "discussions were ongoing and no agreement had been

12   reached."[104]  Similarly, on August 18, 2024, the Nordstrom Brothers advisors informed the Special

13   Committee they would need an additional one to two weeks before submitting a proposal because

14   "no agreement has yet been reached."[105]

15   100.    These representations were false because, as discussed herein, Liverpool and *the*

16   *Nordstrom Brothers had already reached an AAU to work together to acquire the Company*. In

17   addition to their earlier agreements to work together to put together a proposal to take Nordstrom

18   private, these August 2024 representations *made clear that Liverpool and the Nordstrom Brothers*

19   *were in the final stages of submitting a proposal and intended to "reach an agreement" on*

20   *specific proposed terms to acquire the remaining Nordstrom shares before submitting a formal*

21   *proposal or receiving a waiver from the Board under the Anti-Takeover Statute.* Indeed, in

22   August, Peter Nordstrom informed the Special Committee that the Nordstrom Brothers and

23   Liverpool were in the "final stages" of preparing a proposal together,[106] and Erik Nordstrom

---

24       [102] NORDSTROM00000122 ("Mr. Erik Nordstrom reported that [Liverpool] indicated a willingness to participate
25   at a maximum level of 60% of the total capital required, placing *them* in a position of having 86% of necessary capital.")
     (emphasis added).

26       [103] NORDSTROM00000126 ("Mr. Pete Nordstrom stated they believe there is a path to a proposal with [Liverpool]
     and members of the Nordstrom family and a small amount of incremental debt.").

         [104] NORDSTROM00000128.

27       [105] NORDSTROM00000129.

28       [106] NORDSTROM00000128 ("Mr. [Peter] Nordstrom had indicated…he believed preparation of a proposal [with
     Liverpool] was in final stages."). Notably, the August 14 Special Committee meeting is not disclosed in the Proxy.

1    likewise told the Special Committee that conversations with Liverpool had "been very

2    constructive," so much so that Erik Nordstrom did not expect any "substantive roadblocks to a

3    proposal."[107] Moreover, the Nordstrom Brothers' advisors shared their beliefs there was "a clear

4    path to a proposal."[108]

5        101.    Finally, on August 31, 2024, Erik Nordstrom informed Sprunk that "a request for a

6    waiver to form a group with [Liverpool] and members of the Nordstrom family was imminent"

7    and their attorneys submitted that formal request that same day.[109]

8        102.    The Special Committee met the next day to discuss whether to approve the

9    formation of the Buyer Group (also referred to in documents as "Bid Group") and waive the

10   applicability of the Company's poison pill and the Anti-Takeover Statute to the Buyer Group.[110]

11   Centerview already knew details of the forthcoming proposal, including that it was "expected to

12   include approximately $250 million in debt with some type of loan to the Nordstrom family

13   members from [Liverpool] to achieve a near equal ownership structure."[111]  Centerview could only

14   have known details of the proposal if the Buyer Group had already reached an agreement on what

15   that proposal would be.

16       103.    The Special Committee adopted resolutions on September 1, 2024, recommending

17   that the Board approve the formation of the Buyer Group consisting of Liverpool and numerous

18   members[112] of the Nordstrom family and their respective affiliates.  Those resolutions

19   acknowledged that, to that point, the Board had only approved the formation of a "group among

20   Messrs. Erik and Peter Nordstrom and one or more of Bruce A. Nordstrom, Annee E. Gittinger,

21   James F. Nordstrom, Jr., or any of their affiliates or associates[.]"[113] ***Therefore, any AAU among***

22

23

---

24   [107] NORDSTROM00000129 ("Mr. Erik Nordstrom added that recent conversations with the principals of
     [Liverpool] have been very constructive and that, while no agreement has yet been reached, he does not expect any

25   substantive roadblocks to a proposal.").
     [108] NORDSTROM00000129 (WilmerHale expressed its belief with "high confidence").

26   [109] NORDSTROM00000130; Proxy at 44.
     [110] NORDSTROM00000130.

27   [111]*Id.*
     [112] The list included thirty-four different Nordstrom Family members or their associated trusts.

28   [113] NORDSTROM00000133.

**HAGENS BERMAN**

1    *members of the Nordstrom Family and Liverpool—like the AAU described herein—prior to*

2    *receiving approval for such AAU from the Board triggered the Anti-Takeover Statute.*

3    104.    Those resolutions also stated that the Buyer Group had already provided to the

4    Special Committee a "Letter Agreement" that would be executed by each member of the Buyer

5    Group and the Company governing the terms the Buyer Group's disbandment.[114]   The Buyer

6    Group's subsequent Schedule 13D filings indicate that this Letter Agreement refers to an

7    agreement by the new members of the Buyer Group to be bound by certain provisions of Section

8    10(a) of the April 17, 2024 Letter Agreement where the Nordstrom Brothers agreed that their initial

9    small limited group would disband no later than April 17, 2025.

10    105.    Effective September 3, 2024, the full Board signed a unanimous written consent

11    purporting to approve the formation of the Buyer Group such that any subsequently agreed-to

12    transaction, like the Merger, would not be subjected to the heightened approval requirements of

13    the Anti-Takeover Statute (the "***Belated Board Approval***").[115]   However, ***this approval came after***

14    ***the formation of the Buyer Group and was ineffective.***

15    106.    For example, the Board resolutions state that the "Special Committee has discussed

16    the execution and delivery by the Company of a letter agreement governing the disbandment of

17    the Bid Group," which indicates the parties had already signed that agreement before the adoption

18    of the Board's resolutions.[116]

19    107.    Further, immediately following the execution of the Board resolutions, the Buyer

20    Group submitted a detailed letter to the Special Committee confirming that the Buyer Group had

21    reached an AAU to acquire the Nordstrom shares they did not already own before receiving Board

22    approval to submit the proposal.  The Buyer Group's September 3, 2024, proposal noted that they

23    collectively already owned 43% of Nordstrom's outstanding shares—well in excess of the Anti-

24    Takeover Statute's 10% threshold—and had agreed on numerous key terms pursuant to which they

25    sought to take the Company private, including the following terms:

26

27    ---
      [114] *Id.* at 132-137.
      [115] NORDSTROM00000224.
28    [116] NORDSTROM00000225.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

- $23.00 per share purchase price;

- The funding of the currently underfunded amount of the Company's Supplemental Executive Retirement Plan with the except of amounts due to be funded on behalf of Erick, Peter, and Jamie Nordstrom;

- The Nordstrom Family would collectively own 50.1% and Liverpool would own 49.9% of the post-close Company;

- The structure of the transaction, which would require the merger of a newly-formed wholly owned corporate subsidiary of an entity owned by the Buyer Group with and into the Company;

- A detailed sources and uses table, including: (i) the Rollover of 49.6 million shares owned by the Nordstrom Family and 15.775 million shares owned by Liverpool; (ii) the provision of $454 million of additional equity capital by the Nordstrom Family and $1.23 billion of additional equity capital by Liverpool;[117] and (iii) the incurrence of $250 million of incremental bank financing for which they had already received preliminary proposal from two lenders:[118]

| Sources ($ in millions) | | Uses ($ in millions) | |
|---|---|---|---|
| Company Cash on Balance Sheet | $ 620 | Company Equity Value | $3,764 |
| Company Existing Debt | 2,615 | Existing Debt | 2,615 |
| New Transaction Debt | 250 | SERP Funding | 140 |
| Family Investor Equity Roll | 1,141 | Preliminary Transaction Fees | 50 |
| Family New Equity | 454 | Minimum Cash Balance at the Company | 100 |
| Liverpool Equity Roll | 362 | | |
| Liverpool New Equity | 1,226 | | |
| **Total Sources** | **$6,669** | **Total Uses** | **$6,669** |

108.   The letter also stated that the Nordstrom "Family Group and Liverpool have all approved the making of this Proposal" and that they had no intention to sell their shares to a third-party in an alternative transaction.[119]  The proposal also stated that in the Buyer Group's "capacity

---

[117] In response to questions from the Special Committee's advisors, the Buyer Group confirmed that the Nordstrom Family's additional equity commitment would be funded by a loan from Liverpool, further confirming that the members of the Buyer Group had reached an AAU prior to the submission of this proposal.

[118] September 3, 2024 Buyer Group Proposal Letter.  The proposal's maintenance of the Company's existing debt on the balance sheet would require the parties to ensure that all three credit rating agencies did not downgrade the credit rating on the Company's notes following the close of the Merger.

[119] September 3, 2024 Buyer Group Proposal Letter.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  as shareholders, we currently have no intention to vote in favor of any alternative or competing

2  sale, merger or similar transaction involving the Company."[120]

3      109.    It strains credulity to believe that the Buyer Group did not have an AAU prior to

4  Belated Board Approval.  Several facts indicate the existence of an AAU, including:  (i) the  Buyer

5  Group's admitted desire to reach an agreement among themselves prior to the Belated Board

6  Approval, (ii) the new members of the Buyer Group's consent to the Letter Agreement prior to the

7  Belated Board Approval, and (iii) the concurrent submission of their detailed takeover proposal

8  following the Belated Board Approval.

9      110.    ***Because the Nordstrom Family and Liverpool reached an AAU prior to the***

10  ***Belated Board Approval, the Anti-Takeover Statute required that the Merger be conditioned on***

11  ***the approval of the holders of two-thirds of the Company's shares not held by members of the***

12  ***Buyer Group. The Merger is not subject to this condition***.[121]

13  **H.**    **The Parties Reach an Agreement for the Sale of Nordstrom**

14      111.    On September 11, 2024, the Special Committee met to discuss the Buyer Group's

15  proposal.[122]  At that meeting, the Special Committee's advisors reported that management's latest

16  long-term plan, which updated the prior November 2023 plan and had been shared with the Board

17  in August 2024, projected higher growth and lower capital expenditures than before.[123]  These

18  changes would increase the value of Nordstrom.  Moreover, even this updated version of the long-

19  term plan did not include a potential $280 million payment the Company could receive in the near-

20  term from a potential credit card deal with TD Bank (the "TD Bank Deal"), which would further

21  increase the value of Nordstrom.[124]

22

23

---

24    [120] September 3, 2024 Buyer Group Proposal Letter.

25    [121] *See* Proxy at ix ("Requisite Shareholder Approvals means the approval of the Merger Agreement Proposal by the affirmative vote of (1) the holders of shares of Nordstrom Common Stock representing two-thirds of the outstanding shares of Nordstrom Common Stock entitled to vote thereon at the Special Meeting and (2) the holders of shares of

26  Nordstrom Common Stock representing a majority of the outstanding shares of Nordstrom Common Stock entitled to vote thereon at the Special Meeting other than shares owned, directly or indirectly, by the Parent Parties [i.e., the Buyer Group] or by any director or officer.").

27    [122] NORDSTROM00000140.

  [123] *Id.*

28    [124] *Id.*

112.     Additionally, the $23.00 offer did not even include a typical premium to the Company's trading price, which closed at $22.83 on September 3, 2024 and $22.34 the trading day prior on August 30, 2024.  Nonetheless, the Special Committee agreed to negotiate on the basis of the Buyer Group's opportunistic proposal.

113.     On September 15, 2024, the Special Committee determined to recommend to the other outside directors that that they submit a $27 per share counter proposal to the Buyer Group, partly based on the updated long-term plan and the expected TD Bank Deal.[125]  At a September 18, 2024 meeting, the remaining directors other than the Nordstrom Brothers agreed to this plan. Thereafter, the Special Committee and the Buyer Group continued to negotiate the financial and other terms of the Merger.[126]

114.     On September 26, 2024, the Buyer Group increased its offer to $23.75 per share and responded to the Special Committee's proposed Merger Agreement term sheet in a manner that significantly reduced the certainty of closing.[127]  On October 3, 2024, the Special Committee submitted a $25.75 per share counteroffer and on October 9, 2024, the Buyer Group increased its offer to $24.00 per share.[128]

115.     On October 15, 2024, the Special Committee submitted another counteroffer worth $25.00 per share.[129]  In response, the Buyer Group made what it characterized as its best and final offer $24.25 per share.[130]

116.     The Special Committee met to discuss the final offer on October 18, 2024.  On that day, the Company's stock price closed at $24.67.  Instead of rejecting the proposed $24.25 price out of hand, the Special Committee determined to proceed based on this price and make further progress on the definitive documents governing the proposed Merger before making a final decision on whether to agree to the Merger.[131]

---

[125] NORDSTROM00000145.
[126] NORDSTROM00000147.
[127] NORDSTROM00000148.
[128] Proxy at 48-49.
[129] Proxy at 49.
[130] Proxy at 50.
[131] NORDSTROM00000161.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

117.    On November 15, 2024, the Special Committee discussed the presentation the Buyer Group intended to make to the three credit ratings agencies to ensure sure all three would not downgrade the Company's notes.[132] Through that presentation, the Special Committee learned that the Buyer Group had slightly modified their planned financing such that Liverpool would make a loan to the buying entity instead of directly to the Nordstrom Family and that Liverpool would be investing less than previously intended.[133] These changes were attributable, at least in part, to the $280 million payment Nordstrom received in connection with the TD Bank Deal and could have increased the Buyer Group's ability to pay more to Nordstrom's public investors.[134]

118.    On November 16, 2024, the Special Committee discussed whether to ask the Buyer Group to increase its $24.25 offer as a result of, among other things, the Company's recently increased trading price, the receipt of the TD Bank Deal payment, and the changes in the contemplated Liverpool financing structure and amount.[135] The Special Committee determined it would be too risky to ask the Buyer Group to increase the per share offer, but that it would ask the Buyer Group to approve the issuance of a $0.25 per share cash dividend at closing, much of which would be distributed to the Buyer Group itself.[136] On November 20, 2024, the Special Committee met with the other outside directors to discuss this approach and all agreed to move forward on that basis. The Buyer Group then agreed to proceed with the principle of including a dividend so long as the Company had sufficient cash.[137]

119.    On November 26, 2024, the Company reported another strong quarter, beating analyst expectations for sales and earnings and delivering the Company's fourth consecutive quarter of positive net sales growth. However, as one analyst observed, the Company's upward trajectory and valuation was being "anchored" by the lingering take-private discussions.[138]

---

[132] NORDSTROM00000172.

[133] *Id.*

[134] *Id.*

[135] NORDSTROM00000173.

[136] *Id.*

[137] NORDSTROM00000177.

[138] *See* Oliver Chen et al., *3Q24: Positive Momentum Continues But Valuation Anchored Near Go-Private Offer*, Cowen Research (Nov. 27, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

120.    In early December, the Buyer Group met with the three credit rating agencies.[139]



[140]

.[141]

.[142]

121.

[143]

The Special Committee also discussed that the Company's fourth quarter financial performance was 3% ahead of the prior year and $39 million ahead of the management plan despite being $40 million behind the plan after the first two weeks of the fourth quarter.[144]

122.    On December 18, 2024, the Special Committee met to discuss the status of finalizing the Merger and updated management projections that, among other things, now included the $280 million TD Bank Deal payment, and actual third quarter results, and guidance for the fourth quarter.[145]

123.    On December 19, 2024, the Special Committee's advisors reported that the updated projections increased the top and bottom ranges of their discounted cash value analyses by approximately $2 per share.[146]  Nonetheless, the Special Committee did not ask the Buyer Group to increase its offer, determining that "further price negotiation would be disruptive to the process," and that Liverpool indicated it "did not have any willingness to pay more than the current offer price[.]".[147]

124.    On December 22, 2024, the Special Committee and Board held a joint meeting with the Nordstrom Brothers recused.[148]

---

[139] NORDSTROM00000182.
[140] Id.
[141] Id.
[142] Id.
[143] Id.
[144]  EId.
[145] NORDSTROM00000184.
[146] NORDSTROM00000186.
[147] NORDSTROM00000186-187.
[148] NORDSTROM00000190.



1

2                                                             [149]  At the conclusion of the

3    meeting, the Special Committee recommended that the Board approve the Merger, and the Board

4    then proceeded to do so.[150]

5         125.    Pursuant to the terms of the Merger, the Buyer Group will acquire the Company for

6    $24.25 per share in cash and the Company shall be permitted to pay a $0.25 per share special

7    dividend contingent on the close of the Merger and the Company's cash on hand.

8         126.    The Merger Agreement conditions the closing of the Merger on, among other

9    things: (i) the approval of shareholders owning two-thirds of the Company's outstanding shares,

10   including the 43% of the shares held by members of the Buyer Group; and (ii) the approval of

11   shareholders owning a majority of the of the Company's outstanding shares excluding the shares

12   held by members of the Buyer Group.

13        127.    Because the Merger is not conditioned on the approval of the holders of two-thirds

14   of the Company's shares not held by members of the Buyer Group, if the parties close the Merger

15   after only receiving the stockholder approvals required by the Merger Agreement, they will violate

16   the Anti-Takeover Statute.

17   **I.    The Merger is Unfair**

18        128.    In addition to violating the requirements of the Anti-Takeover Statute, the Merger

19   is unfair to the Nordstrom's public stockholders.

20        129.    *First*, stockholders owning approximately 43% of the Company's outstanding

21   shares are rolling over their equity instead of accepting the $24.25 per share cash consideration.

22   These stockholders include the Company's most knowledgeable and best-positioned stockholders

23   to understand the Company's future prospect.

24        130.    The Nordstrom Family founded the Company, and its lead members, the Nordstrom

25   Brothers, are the Company's two most important officers.  Erik Nordstrom has worked at the

26   Company for over forty years and has served as its CEO since 2020.  Peter has also worked at the

27   _____

28       [149] *Id.*
         [150] *Id.*

1  Company for over forty years and has served as its President and Chief Brand Officer since 2020.

2  Liverpool is a sprawling company that operates large department store chains around the world.

3  Their decision to take the Company private without selling any shares reflects their strong belief

4  that the Merger significantly undervalues Nordstrom.[151]

5       131.    *Second*, the Buyer Group as constituted were jointly the Company's controlling

6  stockholders.  The mere presence of controlling stockholders on the other side of a transaction

7  creates an inherently coercive environment.  Here, the Buyer Group not only held a near majority

8  of the outstanding shares, but included the Company's top executives and the family that founded

9  Nordstrom.  They made clear they would not support any alternative deal, which severely limited

10 the Special Committee's options.  No special committee is likely to negotiate hard against such a

11 group and this Special Committee was no different.

12      132.    Indeed, the Special Committee permitted members of the Buyer Group to

13 repeatedly breach Nondisclosure Agreement provisions and ignore deadlines.  The Special

14 Committee ignored the Buyer Group's formation in violation of the Anti-Takeover Statute and

15 negotiated a mere 5.4% increase to the Buyer Group's initial $23.00 per share offer.

16      133.    *Third*, the opportunistic nature of the Merger is reflected in the Company's stock

17 price and performance in the months leading up to the Merger:



23      134.    The Buyer Group's initial $23 offer was barely higher than the stock's closing price

24 of $22.82 that same day.  The Company's stock price reached $24.67 in mid-October 2024, which

25 was around the time the Buyer Group submitted its best and final proposal of $24.25 and reached

---

27 [151] *See, e.g.*, Jeannette Neumann, *Nordstrom Family to Take Chain Private in $6.25 Billion Deal*, Bloomberg News (Dec. 23, 2024) (Morningstar Equity Research's David Swartz: "The Nordstrom family and El Puerto de Liverpool are getting a good deal here and buying Nordstrom when its results are depressed . . . I think that Nordstrom's results are set to improve and that the insiders know this.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

a high of $24.90 in late November 2024. Moreover, Nordstrom's stock closed at $24.53 on December 20, 2024, the last trading day prior to the announcement of the Merger. As a result, the Merger was a take-under, representing a 1.1% discount to the prior day's trading price and a 2.6% discount to the 53-week high from November. The $24.25 Merger price represented a paltry 4.9% premium to the Company's 30-Day volume weighted average price and a 5.4% premium to the Company's 60-Day volume weighted average price.

135. *Fourth*, consistent with the Buyer Group's belief that the Merger undervalues Nordstrom, management's projections for Nordstrom exceeded those of equity analysts without insight into the Company's internal operations. As discussed above, those projections went up significantly during the process, including as a result of a $280 million payment received in connection with the TD Bank Deal. Moreover, the Company's fourth quarter performance in 2024 was on pace to significantly outperform the Company's plan by $39 million despite a slow start to the fourth quarter.

136. Still, the Special Committee failed to use the leverage of the Company's stock price and internal performance and projections to demand an increase to the $24.25 purchase price.

137. *Fifth,* Morgan Stanley's and Centerview's discounted cash flow analyses showed the Merger undervalues Nordstrom. Using management's projections, Morgan Stanley's and Centerview's discounted cash flow valuation analyses resulted in valuations of Nordstrom with mid-points of $25.75 and $25.90, respectively. Even these analyses appear to artificially depress Nordstrom's value. Centerview's analysis also used a significantly higher cost of capital than Morgan Stanley's, which drove down Centerview's valuation. The discrepancy appears to be primarily driven by Morgan Stanley's use of Nordstrom's then-current weighted average cost of debt as compared to Centerview's use of an illustrative cost of debt based on trading yields for Nordstrom bonds and selected peers. Centerview also used an unreasonably low perpetuity growth rate range of 1.5% to 2.5% instead of a range that better matched inflation. For its part, Morgan Stanley used an unreasonably low exit multiple range, rather than a perpetuity rate in its analysis of 3.5x to 5.0x even though Nordstrom itself traded in a range roughly between 4.1x and 5.7x over

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

1  the prior two years and the Merger itself was priced at 5.5x to the 2024 plan and 4.9x to the 2025
2  plan.

3    138.    *Sixth*, numerous equity analysts established price targets that were higher than the
4  Merger price, including Morningstar ($38.50), Telsey ($26.00), Gordon Haskett ($25.00), Citi
5  ($25.00), and TD Cowen ($25.00).  Following the announcement of the Merger, analysts at Telsey
6  wrote that the Merger's valuation at 5.3x NTM EBITDA (per their estimates) "does not come as a
7  premium to a historical average of 5x-6x for both [Nordstrom] and the department store space by
8  our calculation," and that "with earnings beats in the past two quarters, the company had been
9  showing some improved momentum, and the Nordstrom Rack business provides a growth
10  opportunity with exposure to the stronger off-price channel that other department store players do
11  not have."[152]

12    139.    *Seventh*, the Merger price was artificially constrained by unique structural factors.
13  The Buyer Group made clear that it was imperative that the Company's notes not be downgraded
14  by all three credit rating agencies.  That limited the amount of new debt that could be borrowed to
15  fund and increase the purchase price.  The Company could have remained a standalone entity and
16  used profits over the following years to pay down debt and improve its balance sheet so that this
17  would not be an issue in a future take-private.  Relatedly, all of the new equity financing for the
18  Merger is being provided by Liverpool either directly or through an indirect loan to the Nordstrom
19  Family.  Despite this large capital outlay, Liverpool will only own and control 49.9% of the post-
20  close equity.  Most private equity investors would limit the equity they would provide if it means
21  they will not have control of the post-close company.

22                      **V.    CLASS ACTION ALLEGATIONS**

23    140.    Plaintiff brings this action individually and on behalf of all other holders of
24  Nordstrom common stock who have been harmed as discussed herein (the "Class").  Excluded
25  from the Class are Defendants and any person, firm, trust, corporation, legal representative, heir,
26  successor, assign, or other entity affiliated with the Defendants.

27

28  ――――――――――
[152] Dana Telsey et al., *JWN has Agreed to be Acquired by Nordstrom Family and Liverpool; Lowering PT To $24*, Telsey Advisory Group (Dec. 24, 2024).

**HAGENS BERMAN**

141.    This Action is properly maintainable as a class action.

142.    The Class is so numerous that joinder of all members would be impracticable.  As of March 14, 2025, Nordstrom had 166,898,470 shares of common stock outstanding, presumably held by thousands of stockholders located throughout the United States and the world.

143.    The case presents questions of law and fact that are common to all class members that supersede the importance of any question(s) that affect particular individuals, including whether:

  A.  The Merger breaches the Anti-Takeover Statute;

  B.  The Buyer Group Defendants breached their fiduciary duties as controlling stockholders;

  C.  The Director Defendants breached their fiduciary duties;

  D.  Plaintiff and the Class have been harmed; and

  E.  Plaintiff and the Class are entitled to damages or other appropriate relief.

144.    Plaintiff's claims and defenses are typical of the claims and defenses of other class members, and Plaintiff has no interests antagonistic or adverse to the interests of other class members.  Plaintiff will fairly and adequately protect the interests of the Class.

145.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

146.    Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

147.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interest

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## COUNT I

### VIOLATION OF THE ANTI-TAKEOVER STATUTE AGAINST NORDSTROM

148.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

149.    The Anti-Takeover Statute sets strict limits on transactions between a Washington corporation and an "acquiring person," defined as "a person or group of persons, other than the target corporation or a subsidiary of the target corporation, who is the beneficial owner of voting shares entitled to cast votes comprising ten percent or more of the voting power of the target corporation." Importantly, a person is considered to "beneficially own" any shares owned by any other person with whom the first person has "any agreement, arrangement, or understanding [an "AAU"], whether or not in writing, for the purpose of acquiring, holding, voting, or disposing of the shares."

150.    As explained herein, the members of the Buyer Group reached an AAU with respect to acquiring the Nordstrom shares they did not own and voting against any alternative transaction to take Nordstrom private ***before*** the Board approved their formation as a group.

151.    As a result, the Anti-Takeover Statute requires the Merger to be conditioned on the approval of holders of two-thirds of Nordstrom's outstanding shares excluding the shares owned by the Buyer Group. However, the Merger Agreement does not condition the Merger on this voting standard.

152.    As a result, the Merger violates the Anti-Takeover Statute and Plaintiff and the Class have been and are being harmed.

153.    Plaintiff has no adequate remedy at law.

## COUNT II

### BREACH OF FIDUCIARY DUTY AGAINST THE BUYER GROUP DEFENDANTS

154.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

155.    The Buyer Group collectively owns 43% of Nordstrom's outstanding stock and includes the members of Company's founding family and its top executives. As a result, the Buyer Group is able to exercise control over the Company. The Buyer Group also exercised control over

VERIFIED STOCKHOLDER CLASS ACTION COMPLAINT – 37
CASE NO. 25-CV-00568-JHC
011293-11/3154264 V2

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

the Merger itself by, among other things, dictating the timing of the process, preventing competing offers, ignoring the wishes of the Special Committee, and violating the Anti-Takeover Statute.

156.    As controlling stockholders, the members of the Buyer Group owed and owe fiduciary duties to Plaintiff and the Class.

157.    In breach of their duties, the Buyer Group Defendants caused the Company to enter into the Merger, which is procedurally and financially unfair to Plaintiff and the Class and violated the Anti-Takeover Statute.

158.    As a result of the actions of the Buyer Group Defendants, Plaintiff and the Class have been harmed.

## COUNT III

### BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS

159.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

160.    As directors of Nordstrom, the Director Defendants owed and owe fiduciary duties to Plaintiff and the Class.

161.    In breach of their duties, the Director Defendants caused the Company to enter into the Merger, which is procedurally and financially unfair to Plaintiff and the Class and violated the Anti-Takeover Statute.

162.    As a result of the actions of the Director Defendants, Plaintiff and the Class have been harmed

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in their favor and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a Class Action;

B.    Declaring that the Merger as currently conditioned violates the Anti-Takeover Statute;

C.    Enjoining the consummation of the Merger unless and until it complies with the Anti-Takeover Statute;

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

D.    Finding that the Buyer Group Defendants breached their duties as controlling stockholders;

E.    Finding that the Director Defendants breached their fiduciary duties as directors;

F.    Awarding Plaintiff and other members of the Class damages, including rescissory damages, and such other equitable relief as appropriate, together with pre- and post-judgment interest thereon;

G.    Awarding Plaintiff the costs and disbursements of this Action, including reasonable attorneys' and experts' fees; and

H.    Awarding such other and further relief as the Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: March 31, 2025                    Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
    Steve W. Berman, WSBA #12536
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com

 *s/ Jason Leviton*
Jason Leviton, WSBA #34106 (voluntarily inactive)
**BLOCK & LEVITON LLP**
260 Franklin St. Suite 1860

Boston, MA 021110
(617) 398-5600
Email: jason@blockleviton.com

Kimberly A. Evans
Lindsay K. Faccenda
Daniel M. Baker
**BLOCK & LEVITON LLP**
222 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 499-3600
Email: kim@blockleviton.com
Email: lindsay@blockleviton.com
Email: daniel@blockleviton.com

Ned Weinberger
**LABATON KELLER SUCHAROW LLP**
222 Delaware Ave., Suite 1510
Wilmington, DE 19801
(302) 573-2540
Email: nweinberger@labaton.com

John Vielandi
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
(212) 907-0700
Email: jvielandi@labaton.com

D. Seamus Kaskela
Adrienne Bell
**KASKELA LAW LLC**
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
(484) 258-1585
Email: skaskela@kaskelalaw.com
Email: abell@kaskelalaw.com

*Attorneys for Plaintiff*


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX